BRYAN KELLEY, a Disabled Person, by his Guardian, Paul Kelley, Plaintiff, v. ASSOCIATED ANESTHESIOLOGISTS, INC., *et al.*, Defendants and Cross-Plaintiffs-Appellees (Burroughs Wellcome Company, Defendant and Cross-Defendant-Appellant).

Third District No. 3—91—0277

Opinion filed March 20, 1992.—Rehearing denied April 23, 1992.

Livingston, Barger, Brandt & Schroeder, of Bloomington (William R. Brandt and Richard E. Stites, of counsel), for appellant.

Rooks, Pitts & Poust, of Joliet (Robert R. Gorbold and Pamela Davis Gorkowski, of counsel), for appellees.

JUSTICE McCUSKEY delivered the opinion of the court:

Defendant drug manufacturer appeals from a judgment entered on a jury verdict apportioning liability between it and defendant anesthesiologists. The drug manufacturer contends the trial court should have entered judgment *n.o.v.* in its favor or, alternatively, ordered a new trial as to liability. We vacate the judgment against the drug manufacturer and assess total liability against defendant anesthesiologists.

Plaintiff, Bryan Kelley, brought an action in medical malpractice against defendants Associated Anesthesiologists, Inc., and John C. Burdon, M.D. (collectively Dr. Burdon), and in products liability against defendant Burroughs Wellcome Co. (Burroughs). Plaintiff's action involved a surgical operation performed during his recovery from an automobile accident.

In May 1985, plaintiff was injured in an automobile accident and taken to St. Francis Medical Center in Peoria, Illinois. He had suffered a closed head injury, a fractured femur, six double-fractured ribs with a flail chest, a collapsed and contused lung, crushed vertebrae, and partial and complete paralysis of the lower extremities. Plaintiff underwent one surgery to repair the femoral fracture, and another on his spinal column to prevent further neurological damage. Later, when the surgical wound on his back reopened, plaintiff was taken to the operating room for a brief surgical procedure to close the wound. It was estimated this procedure would take less than 30 minutes.

Dr. Burdon was plaintiff's anesthesiologist for the third surgery. Dr. Burdon reviewed plaintiff's chart and performed a brief physical

examination. Dr. Burdon testified he knew plaintiff had a closed head injury and crushed vertebrae. He felt plaintiff had some lower extremity nerve disfunction, but he did not think plaintiff was extensively denervated. Experts for plaintiff and Burroughs countered with testimony that plaintiff *did* have extensive denervation of skeletal muscle in his lower extremities at this time.

Plaintiff was brought into the operating room on a gurney in a supine position. Dr. Burdon first administered sodium pentothal to put plaintiff to sleep. Dr. Burdon then administered a drip solution of succinylcholine (a muscle relaxant marketed by Burroughs as Anectine) to allow the insertion of a breathing tube into plaintiff's throat. After one unsuccessful attempt at intubation, Dr. Burdon increased the flow of succinylcholine to further relax plaintiff. Plaintiff was then successfully intubated.

Plaintiff was removed from the gurney and turned to a prone position on the operating table. Immediately after plaintiff was turned, Dr. Burdon was unable to get a pulse. The EKG machine registered a flat tracing. Resuscitative efforts were begun. Hospital records indicate that succinylcholine was initiated at 2035 hours, with cardiac arrest occurring at approximately 2050 hours. Plaintiff was revived, but was without a heartbeat for approximately 29 minutes. The drip solution of succinylcholine was inadvertently left on during a portion of this time. Plaintiff is now severely impaired.

Succinylcholine is a muscle relaxant used to rapidly relax the throat muscles to facilitate insertion of an endotracheal tube. Succinylcholine renders a patient completely flaccid in 30 to 120 seconds, and its effect is gone in four to six minutes.

A risk of using succinylcholine is present in patients with extensive denervation of skeletal muscle, as in a patient with spinal injuries. In patients with extensive skeletal muscle denervation, succinylcholine can cause an excessive rise in the level of potassium in the bloodstream. A hyperkalemic patient can develop serious cardiac arrhythmias and cardiac arrest leading to death.

Plaintiff alleged that Anectine was unreasonably dangerous because of improper and insufficient labeling in the package insert. Plaintiff alleged the insert was deficient in that it (1) stated the drug could be used cautiously or with great caution in patients who tend to become severely hyperkalemic because of its administration; and (2) failed to state the drug should not be used in patients who are at risk to becoming severely hyperkalemic because of its administration.

The jury returned a verdict in favor of plaintiff and against Dr. Burdon and Burroughs. Based upon counterclaims for contribution

filed by defendants, the jury apportioned the verdict 90% against Dr. Burdon and 10% against Burroughs. The trial court entered judgment on the verdicts rendered on plaintiff's claims and on defendants' counterclaims.

Burroughs' main contention on appeal is that the trial court erred in denying Burroughs' motion for judgment notwithstanding the verdict. Burroughs argues that plaintiff failed to show causation between his injury and Burroughs' alleged failure to contraindicate administration of Anectine to patients exhibiting symptoms like plaintiff's. We agree.

A party is entitled to a judgment *n.o.v.* only in cases in which all the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) We conclude from our examination of the record that Burroughs' motion for judgment *n.o.v.* was improperly denied.

The package insert for Anectine stated in pertinent part:
"PRECAUTIONS:
***

Succinylcholine should be administered with great caution to patients recovering from severe trauma *** because in these circumstances it may induce serious cardiac arrhythmias or cardiac arrest. Great caution should be observed also in patients *** who are paraplegic, or have suffered *** extensive denervation of skeletal muscle due to *** injury of the central nervous system *** because such patients tend to become severely hyperkalemic when given succinylcholine.
* * *

ADVERSE REACTIONS: Adverse reactions consist primarily of an extension of the drug's pharmacological actions. It causes profound muscle relaxation resulting in respiratory depression to the point of apnea; this effect may be prolonged. *** The following adverse reactions have been reported: cardiac arrest, *** arrhythmias, *** hyperkalemia, [and] prolonged respiratory depression or apnea ***.

DOSAGE AND ADMINISTRATION: The dosage of succinylcholine is essentially individualized and its administration should always be determined by the clinician after careful assessment of the patient. ***

For Short Surgical Procedures: The average dose for relaxation of short duration is 0.6 mg/kg (±2.0 ml) Anectine *** In-

jection given intravenously. The optimum dose will vary among individuals and may be from 0.3 to 1.1 mg/kg for adults (1.0 to 4.0 ml). Following administration of doses in this range, relaxation develops in about 1 minute; maximum muscular paralysis may persist for about 2 minutes, after which recovery takes place within 4 to 6 minutes. However, very large doses may result in prolonged apnea. An initial test dose of 0.1 mg/kg (±0.5 ml) may be used to determine the sensitivity of the patient and the individual recovery time.

For Long Surgical Procedures: The dosage of succinylcholine administered by infusion depends upon the duration of the surgical procedure and the need for muscle relaxation. The average rate for an adult ranges between 2.5 and 4.3 mg per minute.

Solutions containing 0.1% to 0.2% (1 to 2 mg per ml) succinylcholine have commonly been used for continuous intravenous drip. *** The more dilute solution (0.1% or 1 mg per ml) is probably preferable from the standpoint of ease of control of the rate of administration of the drug and, hence, of relaxation.''

Dr. Burdon testified he was aware of the contents of the package insert. The package insert specifically warned that Anectine may induce hyperkalemia and cardiac arrest in patients recovering from "severe trauma" or in patients with "extensive denervation of skeletal muscle." Evidence presented at trial supported these statements. Dr. Burdon testified the package insert correctly summarized medical literature on the subject and appropriately listed those persons at risk to experience a hyperkalemic reaction to succinylcholine. Dr. Burdon also testified he was aware of the risk of administering succinylcholine to denervated patients. He stated he had used succinylcholine before on extensively denervated patients without adverse results.

Expert testimony established it was basic knowledge to anesthesiologists that the administration of succinylcholine to an extensively denervated patient entailed the risk of hyperkalemia leading to cardiac arrest. Plaintiff's experts opined the administration of succinylcholine to plaintiff caused hyperkalemia and cardiac arrest, and that Dr. Burdon's failure to stop the flow of succinylcholine delayed efforts to revive plaintiff.

No direct proof was presented which showed Burroughs' product was the proximate cause of plaintiff's injury. No testimony was presented that the package insert was unreasonably dangerous or that Burroughs' failure to "positively contraindicate" use of Anectine in

extensively denervated patients proximately caused plaintiff's injury. Experts for the parties testified it is not necessary to absolutely contraindicate the use of succinylcholine in patients with denervated muscle. The experts further acknowledged the package insert's use of the language with "great caution" was not inappropriate.

Crucial to Dr. Burdon's decision to administer succinylcholine was his determination that plaintiff was *not* extensively denervated and therefore not at risk with respect to succinylcholine. Dr. Burdon based his belief on professional literature on the subject and his personal experience in nearly 40 years of practice. Dr. Burdon testified that plaintiff had suffered neither the type nor quantity of "severe" trauma necessary to place plaintiff at risk for cardiac arrest from a hyperkalemic reaction to succinylcholine. Evidence at trial, however, showed that plaintiff was indeed extensively denervated. Since Dr. Burdon failed to identify plaintiff as someone at risk with respect to the administration of succinylcholine, the package insert could *not* have played a causative role in his injuries. Dr. Burdon never felt plaintiff was in the class of persons within which succinylcholine should be prohibited or used with great caution.

Evidence also showed that Dr. Burdon's failure to stop the flow of succinylcholine hampered efforts to revive plaintiff. Testimony was presented that the failure to stop the flow of succinylcholine during resuscitation efforts resulted in the maintenance of a high potassium level in plaintiff which would hinder establishment of a heartbeat. Dr. Burdon acknowledged it was his responsibility to discontinue the drip.

The manner in which Dr. Burdon administered Anectine to plaintiff was *not* recommended by the package insert. The drip method used by Dr. Burdon was recommended only for long (rather than short) surgical procedures. The insert also stated the 0.2% solution used by Dr. Burdon was the *highest* recommended dosage rather than the lowest recommended diluted solution (0.1%). Dr. Burdon testified he felt he was administering Anectine cautiously by using it for a brief period of time. He also testified that a 0.2% solution is the amount he would customarily administer.

The record demonstrates that Dr. Burdon understood the risks involved in administering succinylcholine. Dr. Burdon had used succinylcholine daily for over 30 years. One year prior to the incident, he had read the package insert for Anectine. He had also read the history and content of medical literature regarding succinylcholine. He had used succinylcholine in the past with denervated patients. Even if the insert had absolutely contraindicated the use of succinylcholine in extensively denervated patients, Dr. Burdon would not have heeded the

prohibition because he had failed to diagnose plaintiff as being extensively denervated. Under these circumstances, the package insert could not have proximately caused the injury to plaintiff.

We conclude that the trial court should have granted Burroughs' motion for judgment *n.o.v.* because plaintiff failed to prove the product was unreasonably dangerous or that Burroughs' failure to absolutely contraindicate use of the product in extensively denervated patients was the proximate cause of plaintiff's injury.

Accordingly, the judgment of the trial court is vacated as to Burroughs. Based upon our findings, we enter judgment against defendants Associated Anesthesiologists, Inc., and John C. Burdon, M.D., for the entire amount of the jury verdict.

Reversed.

BARRY, P.J., and STOUDER, J., concur.